United States District Court
Southern District of Texas

**ENTERED**

March 14, 2025

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:24-CV-2451 |
| | § | |
| TURBO SOLUTIONS INC, ALEXANDER | § | |
| V. MILLER, in his individual and corporate | § | |
| capacity. | § | |
| | § | |
| Defendants. | § | |

## ORDER

Pending before the Court is Plaintiff United States of America's ("United States" or "Plaintiff") Motion for Summary Judgment. (Doc. No. 58). Defendants Alexander Miller and Turbo Solutions ("Defendants") did not file any response in opposition. After considering the motion, record, and appliable law, the Court **GRANTS** Plaintiff's Motion for Summary Judgment. (Doc. No. 58). Further, the Court will enter a permanent injunction concurrently with this order.

### I.    Background

The United States filed its complaint and an *ex parte* motion for a temporary restraining order on March 1, 2022. (Doc. Nos. 2; 3). In a hearing on March 18, 2022, all parties consented to a permanent injunction and an order setting forth findings of fact and prohibiting Defendants from continuing certain illegal practices in connection with a credit repair service. (Doc. No. 14). That same day, the Court entered a preliminary injunction requiring Defendants to preserve documents and refrain from making large expenditures outside the ordinary course of business. (Doc. No. 15).

Apparently, after the *agreed* permanent and preliminary injunctions preventing him from operating his business, Defendant Miller posted online that he was "back open for new business," and referred to the lawsuit as "frivolous." (Doc. No. 58-2 at 14). Additionally, Defendants filed a

motion to dismiss, (Doc. No. 21), a motion for emergency sanctions, (Doc. No. 34), and several motions to strike or object to the United States' responses. (Doc. Nos. 33, 39). The Court denied each of Defendants' various motions, (Doc. No. 41, 42, 43), and set a scheduling order for discovery and summary judgment briefing.

At that point, Defendants had not complied with the United States' discovery requests, and so the Court ordered Defendants to comply. (Doc. No. 55). As far as the Court is aware, Defendants still have not complied with the United States' Rule 30 requests. The United States then filed a motion for summary judgment on all claims. (Doc. No. 58). The United States argues that the Court's finding of facts from the March 18, 2022 injunction hearing, as well as the Defendants' stipulations, are sufficient to establish liability on all counts. (Doc. No. 58 at 3). Additionally, Defendants' failure to comply with the Court's discovery order prevents them from presenting evidence to contradict their own prior stipulations. (*Id.* at 4). Based on the Defendants' liability and the Defendants' repeated violations of the Court's prior injunctions, the United States seeks further injunctive relief, a civil penalty of $10,000,000, and a consumer redress penalty of $9,358,224.30. (*Id.* at 14–18).

## II.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then

must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When the defendant moves for summary judgment on an affirmative defense, the defendant must establish each element of the defense as a matter of law. *Crescent Towing & Salvage Co. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1994). Once the defendant carries this burden, the plaintiff then must produce competent summary judgment evidence demonstrating a genuine issue of material fact on at least one element of the defendant's defense. *Kansa Reinsurance Co. v. Congressional Mtg. Corp.*, 20 F.3d 1362, 1371 (5th Cir. 1994).

A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

### III.   Analysis

#### A. The United States Has Established Liability on the Merits of All Claims.

The United States charged Defendants with violating several antitrust and consumer protection statutes—namely, Section 5 of the FTC Act, 15 U.S.C. § 45, the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679–1679j, and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310. The Court has already enjoined Defendants from continuing to operate the credit repair business unlawfully based on the finding that Defendants violated these statutes. Now, the United States has moved for summary judgment on all counts.

The Court finds that summary judgment is warranted because Defendants have effectively stipulated their own liability. To establish this liability, the United States relies on undisputed statements of fact, and the Court's finding of stipulated facts during the injunction hearing. (Doc. No. 58 at 6–7). In this Court's permanent injunction order from March 18, 2022, the Court found, and Defendants stipulated to, the following facts:

> The United States has shown, and Defendants have not contested, that Defendants Turbo Solutions Inc. and Alexander V. Miller have engaged in acts or practices that violate Section 5 of the FTC Act, 15 U.S.C. § 45, CROA, 15 U.S.C. §§ 1679-1679*l*, and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310. In particular, as demonstrated by consumer declarations, consumer complaints, and the additional documentation filed by the United States, the United States has shown, and Defendants have not contested, that in numerous instances, in connection with the marketing and sale of credit repair services, Defendants have falsely claimed they can improve consumers' credit scores by removing all negative items from their credit reports and adding credit building products. In numerous instances, Defendants have also filed or caused to be filed fake identity theft reports on the FTC's identitytheft.gov website. In addition, Defendants have routinely taken prohibited advanced fees for their credit repair services and have not made required disclosures regarding those services.

(Doc. No. 14 at 2). As the parties stipulated to these facts, by law they are conclusively established. *United States v. Caldwell*, 586 F.3d 338, 342 (5th Cir. 2009) ("When one party stipulates to a disputed fact, the stipulation conclusively proves that fact."). As such, Defendants are now judicially estopped from contesting these admitted facts. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *see also Pegram v. Herdrich*, 530 U.S. 211, 227, n.8 (2000) (judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase"); 18B Charles Allen Wright et al., FEDERAL PRACTICE AND PROCEDURE § 4477, (3d ed. June 2024 update) ("Absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.").

In addition, Defendants' conduct during discovery precludes them from using evidence that was not disclosed to defeat the summary judgment motion. Pursuant to Rule 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e)," which requires parties to provide complete disclosures and discovery responses, the party is precluded from subsequently using the omitted "information or witness to provide evidence," including to defeat summary judgment, "unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Defendants have not claimed that their refusal to comply with the Court's discovery order was either harmless or justified. Further, Defendant Miller's invocation of the Fifth Amendment precludes him from providing testimonial evidence to rebut the United States' factual evidence. *See Hinojosa v. Butler*, 547 F.3d 285, 291 (5th Cir. 2008) ("[I]t is well settled that 'the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'") (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)); *see also FTC v. Williams*, Scott & Assocs., Ltd. Liab. Co., 679 F. App'x 836, 838 (11th Cir. 2017) (Defendant who invoked the Fifth Amendment in discovery later precluded from "convert[ing] the privilege from [a] shield . . . into a sword" by putting his version of the facts into written affidavits). Nevertheless, the Court will address each count and analyze the evidence provided.

### a. Section 5 of the FTC Act (Count I)

Section 5 of the FTC Act prohibits "unfair or deceptive practices in or affecting commerce." 15 U.S.C. § 45. An act or practice is deceptive under Section 5(a) if it involves a material representation or omission that is likely to mislead consumers acting reasonably under the circumstances. *FTC v. USA Fin., LLC*, 415 Fed. Appx. 970, 973 (11th Cir. 2011); *FTC v. Namer*, 781 F. Supp. 1136, 1142 (E.D. La. 1991). A misrepresentation is material if it involves facts that

a reasonable person would consider important in choosing a course of action. *See FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008). Express claims are presumed material, so consumers are not required to question their veracity to be deemed reasonable. *FTC v. Direct Mktg. Concepts, Inc.*, 2004 U.S. Dist. LEXIS 11628, at *13-14 (D. Mass. June 23, 2004).

In considering whether a claim is deceptive, the Court must consider the "overall, net impression" created by the representation. *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008), *aff'd* 356 Fed. Appx. 358 (11th Cir. 2009); *FTC v. Stefanchik*, 559, F.3d 924, 928 (9th Cir. 2009); *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) ("the Court must consider the misrepresentations at issue, by viewing [them] as a whole without emphasizing isolated words or phrases apart from their context"). The Government need not prove reliance by each consumer misled by Defendants. *See FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 244 (2d Cir. 2014); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1275 (S.D. Fla. 1999). "Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of [Section 13(b)]." *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) (citations omitted). Neither does the FTC need to prove that Defendants' misrepresentations were made with an intent to defraud or deceive. *See, e.g.*, *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir. 1989).

The United States puts forth evidence to support these agreed facts including statements made by Defendants to the public that Defendants could significantly increase consumers' credits scores and "guarantee results in 40 days." (Doc. No. 58-2 at 3). Similarly, Defendants advertised that they could simply "delete," among other things, student loans, evictions, bankruptcies, hospital bills, and foreclosures. (Doc. No. 58-2 at 4). Defendants also marketed "credit-building

products," which were advertised to "INSTANTLY populate you a [sic] credit score." (*Id.* at 6); see also (Doc. No. 58-3 at 516). These statements and others—including a "guarantee" that a consumer's credit score would go up 200 points in 90 days, (Doc. No. 58-2 at 3–4)—are plainly both false and material.

Regarding falsity, the United States provided evidence that no entity can guarantee specific credit score improvement within a specific time frame without first reviewing a consumer's credit history. Defendants did exactly that. (Doc. No. 58-2 at 6–7). In addition, neither a consumer nor a credit repair company can legally "delete" information from a credit report if it is accurate and up to date. (*Id.* at 7). Finally, numerous consumers testified that Defendants' credit repair services did not remove any negative items from their reports or increase their scores in any way. (*Id.* at 8–9).

Further, the materiality of these representations is likewise undisputed. Express claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994). Still, multiple consumers reported they relied on Defendants' misrepresentations in deciding to purchase their services. (Doc. No. 58-2 at 9). Based on the summary judgment evidence, and facts that Defendants have stipulated, the Court finds that the United States has established Defendants' liability under Section 5 of the FTC Act.

### b. *The Credit Repair Organizations Act, 15 U.S.C. §§ 1679–1679j (Counts II–VI)*

Under CROA, "Credit repair organization" means, among other things, "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of . . .

improving any consumer's credit record, credit history, or credit rating." 15 U.S.C. § 1679a(3). This definition obviously includes the defendants.

First, the United States argues that Defendants violated Section 404(a)(1) of CROA which prohibits credit repair organizations from "mak[ing] any statement, or counsel[ing] or advis[ing] any consumer to make any statement, which is untrue or misleading . . . with respect to any consumer's credit worthiness, credit standing, or credit capacity to . . . any consumer reporting agency." 15 U.S.C. § 1679b(a)(1). The evidence provided shows, and indeed the Court has already found, that Defendants routinely filed false identity theft reports on behalf of customers who were not victims of identity theft. (Doc. No. 14 at 2). These identity theft reports misrepresented to consumer reporting agencies that the information on the credit reports was false in direct violation of Section 404(a)(1).

Section 404(a)(3) of CROA prohibits credit repair organizations from "mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(3). As described above in the Court's analysis of the FTC Act charge, Defendants have made untrue and misleading statements and representations to consumers by claiming that they could remove negative information from the reports and selling "credit building products" that never gave consumer's ownership of the credit lines opened.

Section 404(a)(4) of CROA prohibits "engag[ing], directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(4). Defendants' practice of filing and/or causing to be filed false and deceptive identity theft reports on behalf of its customers also violates this provision of CROA. (Doc. No. 14 at 2).

Section 404(b) of CROA states that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b. It is undisputed that Defendants violated this section by charging or receiving money for the performance of credit repair services that Defendants agreed to perform in the future. (Doc. No. 14 at 2). In fact, Defendants' own social media posts and marketing statements establish that they charge and collect illegal advance fees for their credit repair services and for extensions of credit, and Defendants' telemarketers and call center agents request and collect payment of these advance fees. (Doc. No. 58-2 at 10).

Section 405 of CROA requires credit organizations to provide consumers with a written statement titled "Consumer Credit File Rights Under State and Federal Law" containing the verbatim language contained in the statute before any contract for credit repair services is executed. See U.S.C. § 1679c. The statement must be "provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer." *Id.* The United States points to several declarations from consumers who testify that they were never provided any such written statements prior to their agreements being executed. (Doc. No. 58-2 at 10).

Section 406 of CROA prohibits a credit repair organization from providing services unless a consumer has signed a written contract for the purchase of such services which includes the terms and conditions specified in that Section, including "a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract," which explains the consumer's right to cancel. 15 U.S.C. § 1679d. Consumers who contracted with

9

Defendants similarly testified and signed affidavits stating that Defendant failed to provide them with any such language in the agreements they were given. (Doc. No. 58-2 at 11).

Finally, Section 407 of CROA requires that each contract between a consumer and a credit repair organization for credit repair services shall be accompanied by a form, in duplicate, which has the heading "Notice of Cancellation" and contains in bold face type a statement explaining how the consumer may cancel the contract. 15 U.S.C. § 1679e. Section 407 further requires that "[a]ny consumer who enters into any contract with any credit repair organization shall be given, by the organization—(1) a copy of the completed contract and the disclosure statement required under section 1679c of this title; and (2) a copy of any other document the credit repair organization requires the consumer to sign, at the time the contract or the other document is signed." *Id.* According to the affidavits provided by numerous former consumers, Defendants repeatedly failed to provide consumers who entered into a contract with Defendants a copy of the completed contract and all disclosures required under CROA and a copy of any other document Defendants required the consumers to sign. (Doc. No. 58-2 at 11).

Based on the evidence presented and the Court's previous findings of stipulated facts, the Court finds that the United States has successfully established Defendants' liability under the Credit Repair Organizations Act.

   *c.    FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310 (Counts VII & VIII)*

The United States has alleged that Defendants violated 16 C.F.R. §§ 310.3 and 310.4. To start, Defendants are "sellers" or "telemarketers," engaged in "telemarketing," as these terms are defined in the TSR. 16 C.F.R. § 310.2(z), (bb) and (cc). The TSR prohibits "[m]isrepresenting, directly or by implication . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii).

Based on the Court's previous findings above, and based on the facts stipulated by Defendants previously, Defendants have violated this prohibition numerous times in connection with the telemarketing of their credit repair services by misrepresenting material aspects of their services. These misrepresentations included representing that Defendants will significantly improve consumers' credit scores by, among other things: a) removing negative information from consumers' credit reports or profiles; and/or b) selling credit building products, such as store credit cards, that will appear on consumers' credit reports or profiles. (Doc. No. 14 at 2); *see also supra* at 6–7.

Next, the United States charges Defendants with the violation of Section 310.4(a)(2). This section prohibits sellers and telemarketers from:

> Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until: (i) [t]he time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and (ii) [t]he seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.

16 C.F.R. § 310.4(a)(2). As addressed above, in connection with the telemarketing of credit repair services, Defendants have charged or collected advance fees for credit repair in violation of Section 310.4(a)(2).

Finally, Section 310.4(a)(4) of the TSR prohibits telemarketers and sellers from "[r]equesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person." 16 C.F.R. § 310.4(a)(4). The United States has presented undisputed evidence that Defendants have

requested or received payment of advance fees for trade lines or other extensions of credit, which they have represented can be obtained with a high likelihood of success. (Doc. No. 58-2 at 10, 12).

### d. Defendant Alexander Miller is Liable in His Individual Capacity.

An individual is liable for violations of the FTC Act if he (1) "either participated directly in the deceptive acts or practices or had the authority to control them;" and (2) "either knew or should have known about the deceptive practices." *FTC v. Bay Area Bus. Council*, 423 F.3d 627, 636 (7th Cir. 2005). Knowledge can be proven "with evidence that the individuals had actual knowledge of the material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of high probability of fraud along with an intentional avoidance of the truth." *Id.* (internal citation omitted).

Here, it is undisputed that Defendant Miller was the founder, CEO, and principal of Turbo Solutions. (Doc. No. 58-2 at 1). The United States has provided evidence to show that Defendant Miller was also personally responsible for Turbo Solutions' illegal credit repair business. For example, the Defendants' website states, "Alex [Miller] coined his credit repair process 'The 3 Round Burst'," and advertises that "Alex [Miller] has helped thousands of consumers" improve their credit, and that he held himself out as an expert in the laws applicable to credit repair. (*Id.* at 1–2, 3, 4, 12–13). And, in addition, Defendant Miller has stipulated to facts constituting violations of the FTC Act, CROA and the TSR. (Doc. No. 14).

Based on the summary judgment evidence and stipulated facts, the Court finds that the corporate Defendants and Defendant Miller, in his individual capacity, are all jointly liable for the statutory violations alleged by the United States.

### B. The United States is Entitled to Injunctive and Monetary Relief.

Based on the Court's finding that Defendants are liable on the merits, the United States seeks several forms of relief, including: (1) a permanent injunction prohibiting all defendants from any involvement in credit repair services; (2) a civil penalty of $10,000,000; and (3) an award of $9,358,224.30 in consumer redress. (Doc. No. 58 at 14–18).

### a. Additional Permanent Injunction

A permanent injunction is justified when there is a "cognizable danger of recurrent violation, or some reasonable likelihood of future violations." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). Section 13(b) of the FTC Act provides the FTC may obtain permanent injunctions for violations of "any provision of law enforced by the [FTC]." 15 U.S.C. § 53(b); *see also FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 717–18 (5th Cir. 1982).

In this case, the Court has already entered one permanent injunction prohibiting Defendants from collecting advance fees for credit repair services, communicating that any person can remove accurate non-obsolete negative information from a credit report or profile or can substantially improve a person's credit score or rating, or communicating any other untrue material fact about any credit repair service. (Doc. No. 14 at 2). The United States' evidence, however, shows that Defendants have repeatedly marketed their services purporting 100-to-200-point increases in mere months. (Doc. No. 58-2 at 15–16). Further, Defendants have also repeatedly implied that accurate, non-obsolete information can be "deleted" from credit reports. (*Id.* at 15). Defendants have also continued to illegally collect advanced fees. Based on this evidence, the Court finds that Defendants have repeatedly violated the Court's prior permanent injunction.

Section I of the United States' proposed injunction would ban Defendants from selling credit repair services permanently. To determine the propriety and scope of a permanent injunction, courts consider: "(1) the egregiousness of the defendant's actions, (2) the isolated or

recurrent nature of the infraction, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, and (6) the likelihood that the defendant's occupation will present opportunities for future violations." *US v. Cornerstone Wealth Corp., Inc.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008) (citing *SEC v. Blatt*, 583 F.2d 1325, 1334 n. 29 (5th Cir. 1978)).

Here, each favor weighs in favor of a permanent injunction. First, the conduct was egregious. Regardless of Defendants' conduct prior to the first injunction, they continually violated the injunction throughout the duration of the case by publicly advertising services that were both illegal and enjoined. Second, as the Court has already found a permanent injunction was necessary, Defendants' actions are certainly recurrent. Third, Defendants acted with a high degree of scienter. Not only did Defendants know that their conduct was subject to a lawsuit, but they were informed that it was both illegal *and* subject to an injunction. Nevertheless, Defendants continued to advertise and offer illegal credit repair services. Fourth, Defendants cannot plausibly provide assurances that the future violations will cease because they have been continually violating the injunctions already in place. Fifth, despite Defendants' stipulation to their conduct and the Court's injunction prohibiting it, Defendants have continually advertised and made public statements calling the lawsuit "frivolous" and filing for sanctions against the United States. It is unclear whether the Defendants have conceded or still object to the illegality of their conduct, as they seem to have done both. Sixth, and finally, the Defendant Miller's occupation—running an illegal credit repair service—creates a significant likelihood of future illegal repair services. Thus, without a permanent injunction prohibiting the Defendants from operating in the credit repair industry, the likelihood of future violations is high.

Based on the Court's analysis of these factors, a permanent injunction prohibiting the Defendants from operating any sort of credit repair service is necessary. The Court **GRANTS** the United States' request for an injunction and will enter an injunction in a separate order.

### b. Civil Penalties

Section 5(m) of the Federal Trade Commission Act states that a defendant "shall be liable for a civil penalty of not more than [\$51,744] for each violation" of an FTC rule "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A); see 16 C.F.R. § 1.98(d) (setting maximum penalty). For civil penalties, the knowledge inquiry "is based on objective factors." *United States v. Nat'l Fin. Servs.*, 98 F.3d 131, 139 (4th Cir. 1996); *see also United States v. Dish Network LLC*, 954 F.3d 970, 978 (7th Cir. 2020) (holding that under Section 5(m)(1)(A), a defendant is liable if it either "knew that the act was unlawful or if it should have known the act was unlawful").

Defendants meet the knowledge requirement because Defendant Alexander Miller admits in his Answer to the Complaint that he has "actual knowledge or knowledge fairly implied of the federal credit repair organization laws . . . that apply to and regulate credit repair organizations." *See* (Doc. No. 44 at 3) (admitting to the allegations laid out in Plaintiff's Original Complaint at ¶ 57). Further, according to his own website, Defendant Miller has "mastered" the "Laws that regulate the industry." (Doc. No. 58-2 at 12). It is also undisputed that Defendant Miller had full knowledge of his company's business practices as he was the sole employee.

In determining the amount of the civil penalty, the Court should "take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(C). Here,

15

Defendants have knowingly and repeatedly misrepresented credit repair services, taken illegal pre-service fee payments, and made false statements to customers regarding what results they could expect from Defendants' services. In fact, Defendants continued to do this after they were permanently enjoined from doing so. *See FTC v. Braun*, 2024 WL 449288, *10 (S.D.N.Y. Feb. 6, 2024) (high culpability found for purposes of calculating civil penalties when defendant showed lack of remorse, and repeated illegal conduct). Due to Defendants' refusal to comply with discovery orders, the Court is not aware of any evidence for or against Defendants' ability to pay a fine of $10,000,000, but Defendants did report a revenue of $15,000,000 in 2021 from its credit repair services. (Doc. No. 58-2 at 2). Nevertheless, this factor does not weigh in favor, or against, the proposed penalty.

Finally, based on the Defendants' refusal to comply with prior injunctions, the Court finds that a penalty large enough to significantly impact the Defendants' operation is in the interest of justice. As such, the Court **GRANTS** the United States' request and awards a civil penalty under the FTC Act in the amount of $10,000,000.

### c. Consumer Redress

The FTC Act authorizes the Court to grant "such relief as the court finds necessary to redress injury to consumers" for violations of rules under the FTC Act, including "the refund of money" and "the payment of damages." 15 U.S.C. § 57b(a), (b); *see also FTC v. Elegant Solutions, Inc.*, 2022 WL 2072735, *3 (9th Cir. Jun. 9, 2022) ("Section 19 expressly authorizes 'the refund of money' to remedy a violation of a rule such as the TSR.").[1] The Court has already found

---

[1]    Section 410(b)(1) of CROA states that a violation of CROA "shall constitute an unfair or deceptive act or practice in commerce in violation of section 5(a) of the Federal Trade Commission Act." 15 U.S.C. § 1679h(b)(1). Section 410(b)(2) of CROA provides that the FTC may enforce violations of CROA "in the same manner as if the violation had been a violation of any Federal Trade Commission trade regulation rule." 15 U.S.C. § 1679h(b)(2).

Defendants to have violated the TSR and CROA through, among other things, collecting illegal advanced fees and making false statements to consumers regarding their credit repair services.

Many courts have recognized that the proper remedy under this provision is monetary redress for consumers' loss. *See Elegant Solutions, Inc.*, 2022 WL 2072735, *3 (holding that monetary relief under Section 19 based on total consumer loss is appropriate to redress consumers for defendants' misrepresentations and advanced fees in violation of TSR); *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1171 (C.D. Cal. 2021) ("The appropriate method to redress these consumers under Section 57b is to refund the amounts consumers paid."). Additionally, this is the case regardless of whether *some* consumers may have received some benefit from Defendants' illegal conduct. Since the seller's misrepresentations tainted the consumer's purchasing decisions, the consumer injury is the lost chance to "avoid the purchase entirely," and can only be redressed with a full refund "regardless of any value consumers later received from the product." *FTC v. Zaappaaz*, 2024 WL 1237047, *9 (S.D. Tex. Mar. 21, 2024); *see also Figgie*, 994 F.2d at 606 ("[t]he fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds . . . .). The full amount of customer payments that the United States could verify from bank statements without Defendants' disclosures during discovery is $9,358,224.30. (Doc. No. 58-2 at 2). The United States argues that this entire sum is an appropriate penalty even without evidence that individual consumers relied on false information because the Court can apply a presumption of reliance. (Doc. No. 58 at 25).

The presumption of reliance arises when "(1) the defendant made material misrepresentations . . . of a kind usually relied upon by reasonable prudent persons; (2) [that] were widely disseminated; and (3) consumers actually purchased the defendants' products." *FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 244 (2d Cir. 2014); *Figgie*, 994 F.2d at 605; *McGregor*

17

*v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000). This presumption exists for because the FTC Act "serves a public purpose by authorizing the Commission to seek redress on behalf of injured consumers," and "[r]equiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals" of the Act. *Figgie*, 994 F.2d at 605–09.

The undisputed evidence shows that Defendants made numerous, repeated misrepresentations and advertised illegal credit repair services. Further, this Court has held previously that these advertisements and public statements included misrepresentations. (Doc. No. 14). These misrepresentations, informing potential clients about what results they could expect, are precisely within the category of representations "usually relied upon by reasonable prudent persons." *BlueHippo Funding*, 762 F.3d at 244. Further, Defendants' Instagram account, a primary source for Defendants' advertising, had over 293,000 followers at one point during the relevant period. (Doc. No. 58-2 at 2). Certainly then, the misrepresentations were "widely disseminated." Finally, it is undisputed that consumers actually did purchase Defendants' services. As such, the presumption of reliance applies here, and the Court **GRANTS** the United States request for consumer redress in the amount of $9,358,224.30.

## IV.   Conclusion

For the foregoing reasons, the United States' motion for summary judgment is **GRANTED**. (Doc. No. 58). The Court **ORDERS** Defendants to pay $10,000,000 in civil penalties and $9,358,224.30 in consumer redress to be paid immediately. Further, the Court will enter a final judgment and separate injunction order concurrently with this Order.

Signed this  13  day of March, 2025.

Andrew S. Hanen
United States District Judge